# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

DAMARCUS V. ARMSTRONG,

    Petitioner,

    v.

JOE A. LIZARRAGA,

    Respondent.

No. 2:18-CV-1999-DMC-P

MEMORANDUM OPINION AND ORDER

        Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pursuant to the written consent of all parties (ECF Nos. 10 and 11), this case is before the undersigned judge for all purposes, including entry of a final judgment. See 28 U.S.C. § 636(c). Pending before the court are petitioner's petition for a writ of habeas corpus (ECF No. 1) and respondent's answer (ECF No. 13).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

# I. BACKGROUND

## A. Facts[1]

Findings of fact in the last reasoned state court decision are entitled to a presumption of correctness, rebuttable only by clear and convincing evidence. See Runningeagle v. Ryan, 686 F.3d 759 n.1 (9th Cir. 2012). The California Court of Appeal, First District, recited the following facts, and Petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Osby was killed because his ex-girlfriend's family believed he stole their video game console and laptop computer. Osby lived with his girlfriend Tina Odem at her mother's house for several months before the couple separated around April 2011. A video game console and laptop were discovered missing on the day Osby moved out and the residents of the house suspected that Osby stole the items.
> The Fairfield house had many residents, including Tina Odem, Tina's mother Ryan Odom[2] and Ryan's brother Frank Bigoski. Also resident were Janiel Miller and Jennifer Whittington. Khalil Askari-Roberts, Ryan's boyfriend, was frequently at the house and defendant moved into the house as Tina's boyfriend shortly after Osby departed. These seven individuals were charged with Osby's torture and killing. Tina, Ryan and Bigoski were tried separately from defendant and convicted.[3] The other three entered pleas, two of whom—Miller and Whittington—testified as prosecution witnesses.
> Miller and Whittington testified that Ryan decided to take action against Osby when she heard from a mutual friend that Osby tried to sell electronic equipment matching the description of property taken from her house. Whittington testified that Ryan said she "just wanted to talk" to Osby. Miller testified that Ryan told several house residents, including defendant, that Ryan wanted to "get him back." Ryan said she wanted to question Osby about stealing the electronics and "if he lies" and denies the theft, she would "slap him."
> Ryan asked Whittington to lure Osby to the house by inviting him to join a "lick," or burglary. Whittington telephoned Osby with the fake offer and he agreed to come to the house. Osby arrived at the house on the afternoon of May 12, 2011.[4] Osby was greeted cordially and led to a

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), "... a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

[2] Given a common surname we refer to Ryan Odom and her daughter by their first names.

[3] Ryan's conviction for torture and first degree murder was affirmed on appeal (*People v. Odom* (2016) 244 Cal.App.4th 237) as was Bigoski's torture conviction (*People v. Bigoski* (Feb. 8, 2017, A145458) [nonpub. opn.]). Tina's appeal from her conviction is pending.

[4] Miller said Osby arrived around 3:00 or 4:00 p.m. but Whittington thought it was

converted garage used as a "hangout room" for smoking.

Present in the room were Osby, defendant, Ryan, Tina, Bigoski, Whittington and Askari-Roberts. Whittington closed the door to the smoking room with the group assembled inside. Whittington testified that Ryan punched Osby as soon as the door was closed. Osby stumbled backward into a corner where Ryan, Tina and Askari-Roberts hit and kicked him. Osby fell to the floor and Ryan stood over him, kicking and yelling at him. Defendant, Bigoski and Askari-Roberts stood near Osby's head and Tina near his feet. Referring to the missing video game console, Ryan yelled "You want to steal from my kids?" Osby said he "didn't do it." Whittington saw "a little bit of blood on the floor." She ran from the room and stayed away for five to ten minutes to "get a grip" on her emotions.

Miller testified he was in the laundry room when he heard a loud "commotion" coming from the smoking room next door. Miller entered the room around the time Whittington left it. Upon entering the room, he saw Osby on top of Ryan. Others began grabbing Osby and pulling him off Ryan. Soon Osby was on the floor "being beat up." Defendant and Askari-Roberts held down Osby while Ryan kicked him in the side numerous times. Ryan asked Osby, "Why are you lying to me? Why would you steal from me? Why would you take from my kids? That was their Christmas present." Osby responded, "I didn't do it, Mom. . . . I love you guys. You already know I love you and I wouldn't do anything like that to you."[5]

Osby struggled from the floor and managed to free himself momentarily from the grip of defendant and Askari-Roberts. The two men regained their grip on Osby and held him down on a couch. Bigoski left the room and returned with a bat, which he used to strike Osby. Bigoski swung a second time and accidentally hit Ryan. Ryan told Bigoski to "get rid of the bat, you stupid motherfucker" and he did so. At this point, Osby ran toward the window. Askari-Roberts grabbed him from behind and Osby landed on a bed. Osby continued to struggle. Osby was very strong and, according to Miller, could not have been subdued by any one person in the room. Defendant, Askari-Roberts, Bigoski and Miller each held one of Osby's limbs to keep him pressed to the bed.

Miller heard someone say "go get the tape." Tina left the room and returned with duct tape. Osby began "freaking out" and asked, "What the fuck is wrong with you all?" He implored Ryan, "Come on, mom. You know I would never do nothing like this. Mom, what's wrong with you?" Ryan started crying and defendant told her she was "getting way too emotional" and should leave the room. Ryan left the room with her boyfriend, Askari-Roberts.

With Osby face down on the bed, defendant taped together Osby's wrists behind his back. Defendant then handed the tape to Bigoski. Bigoski taped Osby's legs together. Defendant and Bigoski then hog-tied Osby by bending his legs at the knees, pushing his bound legs upward and joining Osby's legs and arms together. Defendant also taped Osby's mouth shut.

Osby was moved from the bed to the floor where he managed to break the hog-tie linking his hands and feet. Osby sat with his back to the couch, "wiggled" the tape off his mouth and asked, "Can you just take this

---

"maybe 4:00 or 5:00" p.m.

[5] Ryan was commonly called "mom" by young people who were not her children.

3

tape off my face?" Bigoski removed the tape from Osby's face. It looked to Miller like Osby had a broken nose. Osby said "I don't know what's wrong with you all. You all know I didn't do none of this. This is wrong."

Defendant sat near Osby and said, "just tell us where it's at." Defendant held a revolver to Osby's head and repeated the question. Miller and Whittington testified that defendant regularly carried a revolver, which defendant called "Stella." According to Miller, defendant secretly removed the revolver's bullets before pressing it to Osby's head. Osby, thinking the gun was loaded, "freak[ed] out" and said to defendant "come on, man, it doesn't have to be like this man. Come on man, I didn't take it." Defendant pulled the trigger and told Osby "you better tell us where it's at because if you don't, I got one in here." Osby insisted "I didn't do it." Defendant, with his revolver and bullets in hand, told Bigoski and Miller to watch Osby until he returned and walked from the room.

Whittington testified that defendant and Ryan left the house to walk to a taxi company where Askari-Roberts worked. Fairfield Taxi is 0.3 miles from Ryan's house. It was stipulated that Askari-Roberts was working at Fairfield Taxi that night from 9:00 p.m. p.m. until 4:00 a.m. the following morning. Whittington testified that, before leaving the house, Ryan told her to stay out of the room because she is "too sensitive" and does not "know how to act." Whittington returned to the room anyway. In the room, at that time or shortly after, were Bigoski, Miller, Tina, another daughter of Ryan, and Osby. Osby was sitting on the floor leaning on a couch with his ankles and wrists bound with blue tape. Osby was hurt. "His nose looked like it had been broken. There was blood on his face, and his eye was swollen, like almost shut." Osby asked to be set free. "He was saying that he just wanted to see his son, that he wouldn't tell nobody." Whittington testified that Bigoski told Osby defendant was in charge and Bigoski was "just following orders." Miller testified that Bigoski said "I don't want to get killed" and Osby had to wait for defendant to return to "see what he says." Whittington gave Osby a drink of water and held a cigarette for him to smoke. Tina told Whittington that she was a "punk" and "being too nice." Tina telephoned Ryan and Ryan, over the telephone, told Whittington "Get out of the room." Whittington obeyed.

Miller remained in the room until defendant returned. Defendant entered the room from the direction of the carport. Defendant told Bigoski to help him carry Osby from the room and he did so. Tina asked to go with defendant and he told her "No, I don't want you to be a part of this." Defendant also declined Bigoski's offer to go along, saying "I got it." Miller was unsure of the time of day when defendant left the house with Osby. Miller said it was dark outside and estimated it may have been about two hours after sunset. Sunset occurred at 8:10 p.m.[6] Osby was alive when taken from the house, according to Miller.

Around 11:30 p.m., a Mason attending a ceremony in Vallejo saw a white van or SUV drive through the Masonic lodge parking lot.[7] A resident living near the lodge heard a gunshot at 11:30 p.m. or midnight. The next morning, the resident saw a dead man lying on the lodge grounds. The man, later identified as Osby, "was bound. His arms were

---

[6] We take judicial notice of this fact. (Evid. Code, § 452, subd. (h).)
[7] We take judicial notice of the fact that the distance between the Fairfield house and the Vallejo Masonic lodge is 18.2 miles. (Evid. Code, § 452, subd. (h).)

4

tied behind his back and he was blindfolded. He looked like he had a gunshot to his head."

A police officer responded to the scene and he summoned paramedics who pronounced Osby dead. The paramedics apparently tried to provide some aid to Osby because police photographs show "medic pads" affixed to Osby's abdomen. A detective and other officers arrived after the paramedics departed, including Sergeant Mark Nicole who collected evidence. Nicole testified that Osby had a T-shirt tied around his head "in a blindfold style." His hands were bound behind his back at the wrist with blue painter's tape. His ankles were not bound but there were remnants of tape on his pant legs. There was also an adhesive residue around his mouth. After the deputy coroner arrived on the scene, the blindfold was removed and Osby was observed to have a bullet hole in his head. Osby's nose and mouth were bloody, the area around his left eye swollen, and his shoulder bruised.

Nicole testified "there were two distinct areas of blood. One area was directly beneath [Osby's] head where the body was resting, and then about two and a half feet" uphill from the body near his legs "was a smaller area of blood droplets." There was a trail of blood between the droplets and blood pool where Osby's head lay. Nicole testified that the blood trail must have originated at the location of the droplets and ran downhill because "fluids . . . don't flow uphill." Nicole opined that Osby was standing or kneeling at the uphill location of the blood droplets, fell over when shot, and his head came to rest where the blood pool formed.

The forensic pathologist who performed an autopsy testified that Osby died from a gunshot wound to the head and blunt force trauma to the torso. She ruled both injuries a cause of death because "they occurred within a very short period of time, and either alone would have killed him." She was unable to say "whether or not Mr. Osby was alive or dead at the time he was shot."

Osby was alive when he was bound. His wrists were crossed and tightly bound together behind his back with "multiple revolutions of blue-colored duct tape" that obstructed the flow of blood and caused his hands to swell. Osby had multiple bruises and abrasions, including a "railroad track injury" of two parallel contusions "with an area of central pallor" consistent with a blow from a pipe or baseball bat. He suffered massive internal bleeding around his kidneys and pancreas. Such injuries can be inflicted by a vehicular collision and, if "due to an altercation, it would probably be the deceased being kicked." The internal injuries were sufficient to kill him. The pathologist was uncertain how long one could live after sustaining those injuries but opined one would die "within a couple of hours."

Osby had one gunshot wound, which entered the crown of his head one-half inch left of the midline. The bullet traveled from "left to right, back to front, and downward" and lodged at the base of his skull. There were no burns, soot or gun powder stippling on the skin surrounding the entry wound, indicating that the gun was fired at least three feet from Osby's head.

In the course of their investigation, the police obtained defendant's cell phone records. The records show, in summary, that defendant's cell phone traveled from Fairfield to Vallejo, was in Vallejo at the time of the reported shooting, and returned to Fairfield. A custodian of the records testified that defendant's cell phone made and received several calls from Fairfield on May 12, 2011 from 8:37 to 9:51 p.m. At 11:42 p.m., defendant's phone made an outgoing call from Vallejo of almost three

5

minutes duration. Two additional calls were completed in Vallejo then, at 12:03 a.m., a call was received in Fairfield. Another call was received in Fairfield at 12:33 and relayed by a cell tower near Fairfield Taxi. The day after Osby's body was discovered in Vallejo, a text from defendant's phone read "only for a couple days, it's leave or go to the pen for 25-plus."

The police searched Fairfield Taxi and found traces of blood on the carpet of one of their vans. A criminologist compared DNA taken from the blood stain to Osby's DNA and concluded that Osby "cannot be excluded as a substantial contributor" and "one in every 51 individuals also cannot be excluded as a contributor to this DNA profile."

Defendant was arrested and interrogated by the police following a waiver of rights. The interrogating officer told defendant he was arrested for "homicide, kidnapping and torture," and that others had been arrested who implicated him. Defendant replied it "ain't got shit to do with me" but soon admitted his involvement. Defendant said he knew Ryan and others were angry with Osby for stealing a laptop and game console and that Ryan invited Osby to the house because she was "pissed off." Once in the converted garage, Ryan "took off" on Osby and hit him in the face. Osby tried to fight back and defendant and others "pinned" him down. Bigoski hit Osby with a bat. Ryan said to get tape. Defendant used blue duct tape to bind Osby's hands behind his back. Someone else taped his ankles and mouth and put something over his eyes, like a bandana. Defendant left the house with Ryan and walked to Fairfield Taxi where Askari-Roberts worked. On the way, Ryan asked defendant to take Osby "somewhere" and "get rid of him." Defendant said he and Ryan tried to "concoct a plan" as they walked to the taxi company. Defendant obtained a van from Askari-Roberts, who worked at the taxi company, and defendant drove back to the house where he picked up Osby. Defendant denied taking Osby to Vallejo and shooting him. Defendant told the police he took Osby in the van back to the taxi company where he, Ryan and Askari-Roberts discussed what to do next. Defendant said he was "real shaken up." He gave "Stella," his revolver, to Askari-Roberts and said he was going for a walk to "come up with a plan." He "chickened out," turned off his cell phone and did not return to the taxi company. Defendant said he did not know who shot Osby, saying it might have been Ryan, Askari-Roberts or one of their friends. Defendant admitted telling people he "took care of" Osby and "shot him" but said it was a lie.

**B.   Procedural History**

A jury convicted Petitioner of first degree murder, Cal. Penal Code § 187, (Count 1), found the kidnapping special circumstance attendant to the murder charge true, id. at § 190.2(a)(17), and found true that during the commission of the murder petitioner personally and intentionally used a firearm, causing great bodily injury and death to his victim, Keith Osby, id. at §§ 12022.5(a)(1), 12022.53(b), (c), (d). The jury hung on the torture-murder special circumstance attendant to the murder charge, id. at § 190.2(a)(18), as well as on the separate substantive torture charge, id. at § 206. The court declared a mistrial on the torture charge and the torture-murder

6

special circumstance and subsequently dismissed both on the prosecution's motion. Petitioner was sentenced to state prison for life without the possibility of parole, Cal. Penal Code §§ 187, 190.2(a)(17), plus a consecutive term of 25 years to life, id. at § 12022.53(d), with 1,554 days of credit for time served. Petitioner's conviction and sentence were affirmed by the California Court of Appeal, First District, on June 19, 2017, and on August 30, 2017, the California Supreme Court denied Petitioner's petition for review without comment. Petitioner filed the instant federal habeas corpus petition on July 11, 2018.

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner). When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist." Pirtle, 313 F. 3d at 1167.

/ / /

/ / /

/ / /

7

Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under § 2254(d)(1), federal habeas relief is available only where the state court's decision is "contrary to" or represents an "unreasonable application of" clearly established law. Under both standards, "clearly established law" means those holdings of the United States Supreme Court as of the time of the relevant state court decision. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (citing Williams, 529 U.S. at 412). "What matters are the holdings of the Supreme Court, not the holdings of lower federal courts." Plumlee v. Masto, 512 F.3d 1204 (9th Cir. 2008) (en banc). Supreme Court precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it "squarely addresses" an issue. See Moses v. Payne, 555 F.3d 742, 753-54 (9th Cir. 2009) (citing Wright v. Van Patten, 552 U.S. 120, 28 S. Ct. 743, 746 (2008)). For federal law to be clearly established, the Supreme Court must provide a "categorical answer" to the question before the state court. See id.; see also Carey, 549 U.S. at 76-77 (holding that a state court's decision that a defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an unreasonable application of, the Supreme Court's test for determining prejudice created by state conduct at trial because the Court had never applied the test to spectators' conduct). Circuit court precedent may not be used to fill open questions in the Supreme Court's holdings. See Carey, 549 U.S. at 74.

In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the Court), the United States Supreme Court explained these different standards. A state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme Court on the same question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. See id. at 405. A state

court decision is also "contrary to" established law if it applies a rule which contradicts the governing law set forth in Supreme Court cases. See id. In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules. Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard. See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error. See Benn v. Lambert, 283 F.3d 1040, 1052 n.6 (9th Cir. 2002). If so, the next question is whether such error was structural, in which case federal habeas relief is warranted. See id. If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless. See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case. See Wiggins v. Smith, 539 U.S. 510, 520 (2003). While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. See Williams, 529 U.S. at 408-09. The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law. See id. at 410; see also Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003). An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous. See Lockyer, 538 U.S. at 75-76. This is because "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Id. at 75. As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless. See Benn, 283 F.3d at 1052 n.6.

///

9

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000). Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA. See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

### III.  DISCUSSION

Petitioner alleges the trial court made erroneous evidentiary rulings and jury instruction errors. Petitioner raises two arguments in his petition. First, Petitioner contends the trial court erred under state law in permitting an unqualified lay witness to give expert opinions that the victim was standing or kneeling when he was shot, and that the location of the blood on the ground supported the witness's opinion that the victim was standing or kneeling when shot. Petitioner asserts this state law error violated his Fifth Amendment and Fourteenth Amendment rights to due process. Second, Petitioner alleges the trial court erroneously instructed the jury that it could find the kidnapping special circumstance true if it found either that he acted with reckless indifference to human life or if he acted with intent to kill. Petitioner argues this error also violated his Fifth Amendment and Fourteenth Amendment rights to due process.

#### A.  **Evidentiary Rulings**

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941). Because federal habeas relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994). To raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960). In any event, an evidentiary error is considered harmless if it did not have a substantial and injurious effect in determining the jury's verdict. See Padilla v. Terhune, 309 F.3d 614, 621 (9th Cir. 2002); see also Laboa v. Calderon, 224 F.3d 972, 976 (9th Cir. 2001).

Petitioner argues the trial court erred under state law in permitting an unqualified lay witness, Officer Nicole, to give expert opinions that Osby was standing or kneeling when he was shot. Officer Nicole used the location of the blood on the ground to support his opinion that Osby was standing or kneeling when shot. Petitioner contends Officer Nicole is a mere patrol officer without training on blood analysis and therefore unqualified to state an opinion on the blood splatters. In finding this argument unpersuasive, the California Court of Appeal, Third District, held:

> Defendant contends the trial court erred in permitting the prosecutor to elicit an opinion from a non-expert witness regarding a blood trail at the scene of the shooting. As indicated previously, Sergeant Mark Nicole collected evidence. He observed the victim's head dripping blood and laying in a pool of blood about two and a half feet downhill from the victim's lower leg where there were blood droplets. There was a trail of blood between the droplets and the pool. The prosecutor asked Nicole, "The fact that you see a blood trail there, what did that indicate to you because of the direction of the parking lot?" Nicole answered, over

11

objection, that "fluids don't run uphill or flow uphill" so the trail likely originated near the droplets and flowed downhill. The prosecutor asked "What did that indicate to you" and Nicole answered that the victim, when shot, "was positioned differently" from where he "came to rest." Nicole testified the victim was probably kneeling close to where his knees or lower leg area were depicted in photographs, in the area of the blood droplets, and "collapsed or fell over" downhill when shot and blood pooled at his head.

Nicole was not offered as an expert witness and defendant argues that Nicole's testimony was not admissible as lay opinion because blood spatter interpretation and crime scene reconstruction are matters beyond common experience. "Matters that go beyond common experience and require particular scientific knowledge may not properly be the subject of lay opinion testimony." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131.) A trial court's ruling on the admission of lay opinion testimony is reviewed for abuse of discretion. (*Ibid.*)

There was no abuse of discretion here. Nicole did not testify abstractly about blood spatter but gave limited testimony concerning his direct observations about the location of the body and blood relative to the terrain. The situation is unlike the case defendant relies upon, where a criminalist knowledgeable about blood typing inappropriately expanded his testimony to opine that blood stains on the defendant's pants were "caused by blood flying through the air following impact rather than by mere contact with a bloody object." (*People v. Hogan* (1982) 31 Cal.3d 815, 851-853, disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836.) Nicole was not an expert witness whose testimony exceeded his area of expertise. He was a percipient witness who testified about his observations and opinions readily drawn from them. "A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony. (Evid. Code, § 800.)" (*People v. Farnam* (2002) 28 Cal.4th 107, 153.) Nicole's opinion was rationally based on his observations of two blood stains with a trail between them and the common knowledge that "fluids don't . . . flow uphill," leading to his conclusion that the victim was shot uphill and the blood flowed downhill. The opinion was helpful to a clear understanding of Nicole's testimony, particularly his testimony about elevation at the crime scene and the impact the terrain may have had on the location of the body and blood stains.

Defendant argues that Nicole lacked an adequate foundation for drawing any opinions because he arrived after paramedics who "handled and moved Osby's body at least to some extent." The fact that Osby's body was handled before Nicole's arrival was pertinent to the jury's assessment of the value of Nicole's testimony, as defense counsel argued to the jury. But the existence of two distinct areas of blood with a trail of blood between them was documented in photographs and provided a proper foundation for Nicole to offer his testimony concerning their genesis. His testimony was not dependent on Osby's body being in the exact position it was first found.

Nor do we find any prejudicial misconduct in the prosecutor's passing reference to Nicole's testimony as "expert testimony" during closing argument to the jury. Defense counsel argued there was insufficient evidence to convict defendant of murder because, even if defendant shot Osby in the head, Osby was already dead from internal injuries inflicted by others. Counsel, in reviewing Nicole's testimony and photographs of the crime scene, suggested that Osby was not kneeling

12

when shot but that his head may have "projected forward" from the force of the bullet or was moved by medical personnel. In rebuttal, the prosecutor asked the jury to "look at all of the evidence": witness statements that Osby was alive when taken from the house; defendant's "bragg[ing]" to others that he killed Osby; defendant's text message after Osby's death about "laying low"; and the blood stains. Also, the prosecutor rhetorically asked: "Why do you shoot someone who's already dead?" He later remarked: "The [defense claim] that the bleed somehow killed him, even though there's a bullet in the back of his head, the fact that he projects forward, that is not accurate. Ladies and gentlemen, there's no expert testimony to suggest that's true. The expert testimony you have tells you it happened in a different way."

      The prosecutor's reference to "[t]he expert testimony you have" can only refer to Nicole's testimony about the blood trail. That testimony was, indisputably, not expert testimony. However, no objection to the misstatement was made, forfeiting the issue on appeal. (*People v. Clark* (2011) 52 Cal.4th 856, 960.) In any event, there was no prejudicial misconduct. "'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] A defendant asserting prosecutorial misconduct must further establish a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568.) The prosecutor's mischaracterization of Nicole's testimony was neither reprehensible nor a due process violation and, considering everything that was said during closing argument, there is no reasonable likelihood the jury was misled into giving Nicole's opinion more weight than it was due. The prosecutor made only a brief mention of "expert testimony" in a long argument fairly summarizing the evidence.

Respondent argues Petitioner has failed to meet his burden to establish the state court's decision was contrary to or an unreasonable application of clearly established federal law. Respondent seems to raise two arguments in support of this contention: (1) the Supreme Court has not yet made a clear ruling that admission of expert opinion evidence masquerading as lay opinion evidence constitutes a due process violation and thus the state court's determination necessarily could not have been contrary to or an unreasonable application of clearly established law because no such law exists; and (2) federal habeas relief is not available for state law errors and absent clearly established law to the contrary, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceeding so fundamentally unfair as to violate due process and no such unfairness exists here. This Court addresses each argument in turn.

///

///

1    First, Petitioner alleges his Fifth Amendment and Fourteenth Amendment due
2    process rights were violated when the state court allowed perceived "expert" testimony from a lay
3    witness during trial. However, as Respondent correctly points out, nowhere in the petition does
4    Petitioner state how this admission was contrary to or an unreasonable application of clearly
5    established federal law. This Court cannot determine whether a state court action was contrary to
6    or an unreasonable application of federal law when Petitioner fails to state what federal law was
7    implicated. Because Petitioner has failed to articulate how the state court's decision was contrary
8    to or an unreasonable application of clearly established federal law, this claim has no merit.

9    Further, as Respondent also correctly points out, there seems to be no clearly
10   established federal law for Petitioner to cite. Indeed, this Court has found no Supreme Court case
11   stating the admission of alleged expert testimony as lay witness testimony constitutes a per se due
12   process violation sufficient to allow for habeas relief. Because no such Supreme Court case
13   exists, no clearly established law exists. Thus, because "a state court's decision cannot be
14   contrary to or an unreasonable application of clearly established federal law if there is no clearly
15   established federal law" this claim must be dismissed. See Carey, 549 U.S. at 77.

16   Even if the trial court erred in allowing Officer Nicole's testimony, by applying the
17   harmless error standard applicable on collateral review of claims of federal constitutional error,
18   this Court finds that any error was harmless. Even without Officer Nicole's testimony indicating
19   Osby was alive when Petitioner shot him, additional evidence, such as witness testimony,
20   supports the same conclusion. Given that the jury was presented with evidence which would have
21   allowed it to reach the conclusion that Osby was alive when Petitioner shot him, the inclusion of
22   Officer Nicole's blood splatter opinion could not have had a substantial and injurious effect on the
23   verdict. See Padilla, 309 F.3d at 621. Thus, this claim does not constitute a due process violation
24   sufficient to warrant issuance of a writ of habeas corpus.

25   Second, a state court's evidentiary ruling may still be grounds for federal habeas
26   relief if it renders the state proceeding so fundamentally unfair as to violate due process. Here, no
27   such unfairness exists. Officer Nicole did not testify outside of his expertise about blood spatter,
28   but gave limited testimony concerning his direct observations about the location of the body and

blood relative to the terrain of the parking lot.  The admittance of a lay witness's testimony providing an opinion based on his observations, and common knowledge that blood flows downhill, does not "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  See Patterson v. New York, 432 U.S. 197, 202 (1977).  Petitioner has not alleged in his petition that Officer Nicole's testimony rendered the trial fundamentally unfair, but rather repeated the mere existence of the testimony and Officer Nicole's alleged absent qualification to form an opinion on blood splatters.  Accordingly, because the admission of Officer Nicole's testimony was not fundamentally unfair as to violate due process, this claim does not warrant the issuance of a writ of habeas corpus.

### B. Jury Instructions

In general, to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner must demonstrate that an erroneous instruction "so infected the entire trial that the resulting conviction violates due process."  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147) (internal quotation marks omitted).  In making its determination, this Court must evaluate an allegedly ambiguous jury instruction "'in the context of the overall charge to the jury as a component of the entire trial process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Where an instruction is missing a necessary element completely, the "reasonable likelihood" standard does not apply and the court may not ". . . assume that the jurors inferred the missing element from their general experience or from other instructions . . ."  See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994).  In the case of an instruction which omits a necessary element,

constitutional error has occurred. See id.

Even if there is constitutional error, non-structural errors may be harmless. See Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386 U.S. 18 (1967)). In the context of jury instructions, an error is not structural so long as the error does not "vitiat[e] all the jury's findings." Sullivan v. Louisiana, 508 U.S. 275, 2781 (1993) (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to harmless error analysis). An instructional error which resulted in omission of an element of the offense was a trial error subject to harmless error review. See Hedgpeth, 129 S.Ct. at 532 (citing Neder v. United States, 527 U.S. 1 (1999)). An erroneous aider and abettor instruction is also not structural. See id. (citing California v. Roy, 519 U.S. 2 (1996) (per curiam)). A jury instruction which misstates an element of an offense is also not structural. See id. (citing Pope v. Illinois, 481 U.S. 497 (1987)). An erroneous burden-shifting instruction is also not structural. See id. (citing Rose v. Clark, 478 U.S. 570 (1986)). Finally, an instruction on multiple theories of guilt where one of the theories is improper does not result in a structural error requiring automatic reversal but is error subject to harmless error analysis. See id.

In Chapman, a case before the Supreme Court on direct review, the Court held that "before a [non-structural] constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. A different harmless error standard applies to cases on collateral review. In Brecht v. Abrahamson, the Court stated that applying the Chapman standard on collateral review "undermines the States' interest in finality and infringes upon their sovereignty over criminal matters." 507 U.S. 619, 637. The Court also noted that the Chapman standard is at odds with the historic meaning of habeas corpus – which is meant to afford relief only to those who have been grievously wronged – because it would require relief where there is only a reasonable possibility that a constitutional error contributed to the verdict. See id. Therefore, in habeas cases, the standard applied in Kotteakos v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-structural constitutional errors. See Brecht, 507 U.S. at 637. Under this standard, relief is available where non-structural error occurs only where such error "had a substantial and injurious effect or

influence in determining the jury's verdict." Kotteakos, 328 U.S. at 776.

Petitioner alleges the trial court erroneously instructed the jury that it could find the kidnapping special circumstance true if it found either that he acted with reckless indifference to human life or if he acted with intent to kill. The jury should have been instructed that it had to find Petitioner acted with intent to kill, even if he wasn't the actual killer, in order to find the kidnapping intent to kill special circumstance true. Reckless indifference to human life is insufficient to establish liability. Petitioner contends this instructional error is not harmless beyond a reasonable doubt because Petitioner claims Osby was already dead before being transported, and therefore Petitioner cannot be guilty of kidnapping or the kidnap special circumstance. The California Court of Appeal held:

> Defendant contends the jury instructions misstated the intent requirement for murder committed during a kidnapping. The same instructions were used in the trial of Ryan Odom and, on appeal, found erroneous but harmless. (*People v. Odom, supra,* 244 Cal.App.4th at pp. 251-258 (*Odom*).) We agree on both points.
> The penalty for first degree murder is death or imprisonment for life without the possibility of parole if one or more "special circumstances" are found to be true. (§ 190.2., subd. (a).) One special circumstance is murder committed during the commission of specified felonies, including kidnapping. (§ 190.2, subd. (a)(17)(B).) Intent to kill is not required to sustain a felony-murder special circumstance against the actual killer but accomplice liability requires an intent to kill or reckless indifference to human life. (*Odom, supra,* 244 Cal.App.4th at p. 252.) A different rule applies where the kidnapping lacks an independent felonious purpose and "is committed primarily or solely for the purpose of facilitating the murder." (§ 190.2, subd. (a)(17)(M).) Under these circumstances, "both the actual killer and the accomplice must have the intent to kill" for the special circumstance penalty to apply. (*Ibid.*; *Odom, supra*, at p. 255.)
> Here, as in *Odom*, the prosecutor presented evidence that Osby was kidnapped and taken to a parking lot to be killed. The kidnapping was not committed to advance an independent felonious purpose but to facilitate the murder. In supplemental briefing defendant contests the adequacy of instructions and evidence concerning a kidnapping special circumstance based on an independent felonious purpose. But this theory was never presented to the jury. The prosecution consistently maintained that defendant moved Osby to the parking lot to kill him. Under this theory, the prosecution was required to prove an intent to kill to establish the special circumstance.
> The court gave CALCRIM No. 731, which properly set out the applicable principles. (*Odom, supra,* 244 Cal.App.4th at p. 257.) The instruction states, in relevant part, that "the special circumstance of intentional murder while engaged in the commission of kidnapping" requires proof that the defendant "committed or aided and abetted a kidnapping" causing the death of another person and "defendant intended

17

the other person be killed."

But the court also gave CALCRIM No. 703, which conflicted with CALCRIM No. 731 on the subject of intent. CALCRIM No. 703 states general principles applicable to felony-murder special circumstance accomplice liability. It provides, in relevant part, that the special circumstance is established for "a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor" if the defendant was "a major participant in the crime" and "acted either with intent to kill *or with reckless indifference to human life.*" (Italics added.)

CALCRIM No. 703 is not a proper statement of the intent element for special circumstance accomplice liability where, as here, the kidnapping is "primarily or solely for the purpose of facilitating the murder." (§ 190.2, subd. (a)(17)(M); *Odom, supra,* 244 Cal.App.4th at pp. 256-257.) This "intent to kill special circumstance" requires proof that the defendant intended the victim to be killed – reckless indifference to human life is insufficient to establish liability. (*Ibid.*)

"Instructional error regarding the elements of the offense requires reversal of the judgment unless the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201.) Instructional error is harmless where both proper and improper theories of guilt are presented to the jury but the verdict leaves no reasonable doubt that the jury made the findings necessary on the legally valid theory. (*Id.* at pp. 1204-1205.) In *Odom* the instructional error lessening the standard for accomplice intent was ruled harmless because the jury "found true the torture special circumstance, which required a finding that Ryan Odom 'intended to kill Keith Osby.'" (*Odom, supra,* 244 Cal.App.4th at p. 258.) A comparable situation obtains here. The jury returned a verdict finding that "defendant personally and intentionally discharged a firearm, to wit: a handgun, which proximately caused great bodily injury and death to Keith Osby." The jury necessarily found defendant to be the actual killer who acted with the intent to kill, rejecting the defense claim that Osby was dead from injuries inflicted by others when defendant shot him. The jury did not rely on the improper theory that defendant was an accomplice to the kidnapping acting either with intent to kill or with reckless indifference to human life.

\* \* \*

Defendant contends that his murder conviction, to the extent based on aiding and abetting a group assault, must be reduced to second degree murder. He relies upon *People v. Chiu* (2014) 59 Cal.4th 155, 158, in which a jury found the defendant guilty of first degree murder on the theory that either he directly aided and abetted the murder or he aided and abetted the target offense of assault or of disturbing the peace, the natural and probable consequence of which was murder. The Supreme Court held that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Id.* at pp. 158-159) Finding no basis in the record to conclude that the verdict was based on the legally valid theory that defendant directly aided and abetted the murder, the court reversed the first degree murder conviction. (*Id.* at p. 168.)

The record is different in this case. Here, the verdict was based on the legally valid theory that defendant was the actual killer with an intent to kill, as demonstrated by the jury's finding that defendant personally and

> intentionally discharged a firearm causing Osby's death. Defendant's murder conviction was not based on aiding and abetting a group assault.

An erroneous instruction on multiple theories of guilt, where one of the theories is improper, is subject to harmless error analysis. Because the jury was instructed that it could find the kidnapping intent to kill special circumstance true based on both intent to kill and reckless disregard for human life, with the latter being an improper instruction, Petitioner's claim must be scrutinized under the standard applied in <u>Kotteakos</u>, which governs harmless error analysis for non-structural constitutional errors on collateral review. See <u>Brecht</u>, 507 U.S. at 637. Under this standard, relief is only available where such error "had a substantial and injurious effect or influence in determining the jury's verdict." <u>Kotteakos</u>, 328 U.S. at 776. Here, the additional but improper theory of guilt did not have such a substantial and injurious effect on the jury's verdict because the jury found the Petitioner had the necessary intent to kill Osby and that Petitioner was the actual killer.

This necessarily rejects the defense claim that Osby was already dead before being transported and before being shot; thus, the jury did not rely on an accomplice theory or that Petitioner acted with reckless disregard for human life. Accordingly, this claim does not warrant the issuance of a writ of habeas corpus.

### IV. CONCLUSION

Based on the foregoing, the court concludes that petitioner is not entitled to federal habeas corpus relief.

Pursuant to Rule 11(a) of the Federal Rules Governing Section 2254 Cases, the court has considered whether to issue a certificate of appealability. Before petitioner can appeal this decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). Where the petition is denied on the merits, a certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court must either issue a certificate of appealability indicating which issues satisfy the required showing or must state the reasons why

such a certificate should not issue. See Fed. R. App. P. 22(b). Where the petition is dismissed on procedural grounds, a certificate of appealability "should issue if the prisoner can show: (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling'; and (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'" Morris v. Woodford, 229 F.3d 775, 780 (9th Cir. 2000) (quoting Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1604 (2000)). For the reasons stated herein, the court finds that issuance of a certificate of appealability is not warranted in this case.

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's petition for a writ of habeas corpus (ECF No. 1) is denied;
2. The court declines to issue a certificate of appealability; and
3. The Clerk of the Court is directed to enter judgment and close this file.

Dated: July 18, 2019

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE